UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEAN D. RANDALL,<br><br>    Plaintiff,<br><br>    v.<br><br>CHANGE.ORG, INC.,<br><br>    Defendant. | Case No. 20-cv-03863-EMC<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**<br><br>Docket No. 28 |

Plaintiff Sean D. Randall has sued Defendant Change.org PBC for breach of contract, contending that Change.org misused the $3.00 he donated to help promote a petition in support of prosecuting the police officers who killed George Floyd.

Pending before the Court is Change.org's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), or alternatively to strike the class allegations from the second amended complaint (SAC), pursuant Federal Rules of Civil Procedure 12(f), and 23(d)(1)(D). *See* Docket No. 28 ("Mot"). For the following reasons, Change.org's motion to dismiss is **GRANTED** without leave to amend.[1]

## I.     BACKGROUND

A.     Petitions on Change.Org

Change.org is a free website where anyone can create and share petitions to gather support for different causes. *See* Docket No. 15-1 (Declaration by Change.org CEO Benjamin Joffe-Walt

---

[1] The Court need not address Change.org's alternative motion to strike the class averments. Nor need it address whether Mr. Randall has adequately pled a theory for damages.

1   ("Joffe-Walt Decl.")) ¶ 5.[2]  Change.org also cross-promotes petitions to users most likely to be

2   interested in them.  *Id.*  The website has never generated a profit, according to its latest reporting

3   period, which ended in December 2019.  *Id.* ¶ 8.

4       The website accepts no outside advertising, instead obtaining its revenue from two sources:

5   (1) small monthly contributions from participants, and (2) by asking signatories to purchase

6   further advertising of the petitions they have just signed on the Change.org website.  *Id.* ¶ 7.  The

7   "Support" section of Change.org's website (the "Promoted Petitions Page") explains that

8   "[s]imilar to boosted posts on Facebook or sponsored tweets on Twitter, promoted petitions let

9   [signatories] pay to show any petition . . . to other potential supporters *on Change.org or [its]*

10  *distribution channels*," and that "the more . . . supporters chip in, the more people will see the

11  petition."  *Id.* ¶ 12 & Ex. B (emphasis added).  In other words, "[a]fter signing a petition,

12  [signatories] may be presented with the option to promote that petition to other people *on*

13  *Change.org*."  *Id.* (emphasis added).

14  ///

15  ///

16  ///

17  ///

18  ///

19

---

[2] The Court incorporates by reference Mr. Joffe-Walt's declaration because the SAC explicitly referred to and relied upon it.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) ("[A]defendant may seek to incorporate a document into the complaint 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'" (quoting *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)); *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) ("We have extended the doctrine of incorporation by reference to consider documents in situations where the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint, the document's authenticity is not in question and there are no disputed issues as to the document's relevance.").  Indeed, Mr. Randall extensively references and relies on Mr. Joffe-Walt's declaration throughout the SAC. *See e.g.* Docket No. 21 (SAC) at ¶¶ 21 ("As its Chief Operating Officer, Benjamin Joffe, freely admits in a declaration filed with this court, Defendant did not use the donated money for these purposes. (See Doc. 15-1)."); 14 ("In his declaration, Defendant's Chief Operating Officer, Benjamin Joffe-Walt, admits that Change.org does not normally actually use the money for 'offsite advertising,' but instead simply pays itself to advertise on Change.org's website:"); 16 ("What did it do with that money?  Mr. Joffe-Walt's declaration answers that question as well . . ."); 17 ("Mr. Joffe-Walt's declaration also betrays that Change.org believes that . . .").

Similarly, the "Frequently Asked Questions" page on Change.org's website (the "FAQ Page") explains how signatories' contributions help Change.org highlight petitions for other users on the website:

> **1. "Where does the money go? How does the contribution help my petition?"**
>
> When someone chips in to promote a petition it helps us share it with wide audiences of action-takers in the Change.org community. Each contribution helps cover the costs of distributing the petition to hundreds, thousands, even millions more people in the Change.org community, many of whom go on to sign the petition. Together, the signatures help the petition gain media attention, influence decision makers and propel the petition toward victory.

> **3. "Where does Change.org display a promoted petition to make sure it's seen by more people?"**
>
> Once a petition is promoted, we will immediately start to display that petition to other action-takers who are most likely to support the cause. It's what a contributor is paying for, and we take it seriously. You'll see promoted petitions displayed in a number of places including our homepage, nearly every page of the website, in our Change.org emails that are sent to millions of people, on social media and more. New people can then become aware of this campaign and choose to sign it.

> **4. "When someone chips in, do they know how their money will be spent?"**
>
> As a supporter is agreeing to chip in toward a petition, we display the following page to make it clear how their money will be spent.
>
> The amount of money the supporter wants to give correlates to the number of times we'll display the petition. For example, contributing $8 will result in the petition being displayed to 100 people who are most likely to support it.

*Id.* ¶ 15 & Ex. D.

B.      The Floyd Petition on Change.org

After George Floyd's killing in late May, a user named "Kellen S" started a petition on Change.org titled "Justice for George Floyd," calling for the prosecution of the police officers who killed George Floyd (the "Floyd Petition").[3] *See* Docket No. 21 ("SAC.") ¶¶ 2, 8. The Floyd Petition became the most popular ever created on change.org, gathering twenty million signatures and raising $7.7 million.[4] Joffe-Walt Decl. ¶ 9.

C.      Randall's Contribution

On June 6, 2020, Mr. Randall signed the Floyd Petition. SAC, Ex. C. Immediately after

---

[3] Another activist created a similar petition seeking justice for the murder of Breonna Taylor (the "Taylor Petition"). SAC ¶¶ 2, 12.

[4] By comparison, the average U.S.-based Change.org petition in 2019 raised $45 from an average 3.6 people. Joffe-Walt Decl. ¶ 9.

signing, he was prompted to contribute to promote the petition to other Change.org users on the "Solicitation Screen" to which he was directed:

[screenshot of Solicitation Screen: "Can you chip in $3 to get this petition on the agenda? You've just signed the biggest petition ever on Change.org – and while George Floyd's killers have been charged – we are still a long way from reaching justice. The more signatures this petition gets the more influence it will have. Chipping in allows Change.org to put this petition on billboards across the country, blanket social media with calls to join, and email the petition to millions of people. Can you help out?" Become a hero. Join the 8,977,125 people helping reach the next goal. "Yes, I'll chip in $7 or more" / "No, I'll share instead" Pay with credit card or PayPal]

Joffe-Walt Decl. ¶ 14 & Ex. C. Central to Mr. Randall's claim herein, the Solicitation Page stated that "[c]hipping allows Change.org to put this petition on billboards across the country, blanket social media with calls to join, and email the petition to millions of people." *Id.*

1   Upon clicking on the button labeled "yes, I'll chip in $3 or more," Mr. Randall was taken
2   to another screen with several buttons with pre-set contribution amounts, a blank space to enter a
3   different amount, and a payment form (the "Contribution Screen"):



26  *Id.* The Contribution Screen also provided an "Impression Calculation," which told Randall that
27  "$20 will advertise this petition 250 extra times to new supporters." *Id.* Under that calculation,
28  one dollar would perforce buy 12.5 impressions, and three dollars would by 38 impressions. The

5

1  Contribution screen also provided a link to the FAQ Page discussed above.

2  Finally, upon completing his payment, Mr. Randall saw a confirmation screen stating that

3  his "$3.00 will advertise this petition 38 extra times on Change.org" (the "Confirmation Screen"):



27  *Id.* Although the complaint does not so state, Mr. Randall could request a refund after completing

28  his contribution:  Change.org's website states that "[r]efund requests made within 14 days of the

6

1 contribution can be processed and refunded immediately." *Fundraising FAQs*, Change.org (Jan. 9,
2 2019), https://help.change.org/s/article/Fundraising-FAQs?language=en_US (last visited Dec. 3,
3 2020).

### D. What Change.org Did With Mr. Randall's Contribution

On June 3, 2020, three days before Mr. Randall made his contribution, the officers involved in Floyd's killing were finally charged with murder, which was the primary goal of the petition. Accordingly, on June 9, 2020, Change.org stopped soliciting and accepting new advertising contributions for the Floyd Petition because it determined that it would not be socially beneficial anymore, given that the Petition had reached mass appeal and it had achieved its main goal. *Id.* ¶ 27. Change.org followed through, however, with all outstanding commitments to signatories who had contributed to promote the Petition by displaying the Petition—on the website—the number of times it had promised to each contributor. *Id.*

Change.org used Mr. Randall's contribution in several ways. First, it displayed the petition to 39 other users on the Change.org website and via e-mail, one more impression than was promised in the Contribution and Confirmation screens. *Id.* ¶ 24 & Exs. E–I. Second, it spent $102,000 of the $7.7 million raised by the Floyd Petition, which included Mr. Randall's $3.00 contribution, buying 118 digital billboards at locations around the country. *Id.* ¶ 18. Third, and finally, it spent $415,000 of the $7.7 million on promoting the Petition via the social media platforms Facebook and Instagram. *Id.*

Additionally, Change.org used the remaining funds raised from the Floyd and Taylor Petitions—roughly $10 million (net of fees and adjustments)—as follows: (1) $6 million for a fund that will be invested in organizations fighting for racial justice, (2) $2.5 million for promoting other similar racial justice petitions, and (3) $1.5 million for a team within Change.org dedicated to racial justice organizing and advocacy. *Id.* ¶¶ 29–30.

### E. Procedural Background

Mr. Randall filed this class action lawsuit on June 11, 2020, five days after making his contribution, raising one cause of action for breach of contract on behalf of "[a]ll individuals in the United States who donated to a [Change.org] petition including, but not limited to, the [Floyd

Petition]." *See* Docket No. 1 ("Compl.") ¶ 15. After Change.org moved to dismiss or for summary judgment, *see* Docket No. 15, Mr. Randall amended the complaint twice, *see* Docket Nos. 18 (FAC); 21 (SAC). On October 9, 2020, Change.org filed the instant motion to dismiss pursuant to Rule 12(b)(6), or alternatively to strike the SAC's class allegations, pursuant to Rules 12(f), and 23(d)(1)(D). *See* Mot.

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (quoting *Electic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

## III.  MOTION TO DISMISS

Under California law, "the elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 250

1  P.3d 1115, 1121 (Cal. 2011) (citing *Reichert v. Gen. Ins. Co.*, 442 P.3d 321, 377 (Cal. 1968)).
2  Change.org is not disputing that the first and second elements of a breach of contract claim are
3  satisfied here.  Therefore, the only questions before the Court are whether Change.org breached
4  the parties' contract, and if so, whether Mr. Randall suffered any damages as a result of that
5  breach.

A.    Breach

Mr. Randall contends in his SAC that Change.org breached its promise to use his $3.00 donation for ***only*** four purposes: (1) "put th[e Floyd Petition] on billboards across the country;" (2) "blanket social media with calls to join" the Floyd Petition; (3) "email the [Floyd Petition] to millions of people;" and (4) "feature [the Floyd Petition] 38 more times on Change.org to potential supporters." SAC ¶¶ 9–10, 17. This claim fails for several reasons.

First, and most importantly, the plain meaning of the written contract does not require Change.org to use Mr. Randall's contribution ***only*** for billboards, social media calls, email, and featuring the petition on the Change.org website. It is a "[f]undamental precept[] of contract interpretation under California law (and not unique to California)" that "[t]he courts' superseding objective when interpreting a contract is to 'give effect to the mutual intention of the parties as it existed at the time of contracting.'" *Int'l Brotherhood of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1042 (9th Cir. 2020) (quoting Cal. Civ. Code § 1636)). "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible." *Id.* (quoting Cal. Civ. Code § 1639 and citing *MacKinnon v. Truck Ins. Exch.*, 73 P.3d 1205 (Cal. 2003)). "If contractual language is clear and explicit and does not involve an absurdity, the *plain meaning* governs." *Legacy Vulcan Corp. v. Sup. Ct.*, 1110 Cal. Rptr. 3d 795, 803 (2010) (emphasis added) (citing Cal. Civ. Code § 1638).

Here, the Solicitation Screen states that Mr. Randall's contribution "***allows*** Change.org to" advertise the petition on external billboards, social media posts, e-mails, or by securing thirty-eight impressions on the website. SAC ¶¶ 9–10 (emphasis added). Nowhere in that screen—or elsewhere on the site—does it say that Change.org will use Mr. Randall's $3.00 contribution *only* or *exclusively* for those four actions. The term "allow" is permissive; it is not limiting. The

9

dictionary defines the verb "to allow" is "to give permission for someone to do something." *Allow*, CAMBRIDGE DICTIONARY, https:// dictionary. cambridge. org/ dictionary/ english/ allow (last visited Dec. 3, 2020); *see also Allow*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/allow (last visited Dec. 3, 2020) (defining "allow" as "permit" and "to fail to restrain or prevent"); *Allow*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "allow" as "[t]o put no obstacle in the way of;" "to give consent to;" "to approve;" and "to grant permission").

      Furthermore, California law requires the Court to "consider the contract as a whole and interpret its language in context so as to give effect to each provision, rather than interpret contractual language in isolation." *Legacy Vulcan*, 110 Cal. Rptr. 3d at 689 (citing Cal. Civ. Code § 1641); *see also Int'l Brotherhood of Teamsters*, 957 F.3d at 1042 ("[C]ontracts must be construed as a whole . . . and the intention of the parties is to be collected from the *entire instrument* and not detached portions thereof, it being necessary to consider all of the parts to determine the meaning of any particular part as well as of the whole." (quoting *Ajax Magnolia One Corp. v. S. Cal. Edison Co.*, 334 P.2d 1053 (Cal. 1959) and *Moore v. Wood*, 160 P.2d 772 (Cal. 1945)). Here, the contribution screen made clear that the contribution would also be used to advertise the petition to other Change.org supporters. Mr. Randall ignores this portion of the contract.[5]

      Change.org fulfilled its obligations under the contract. It used funds from the Floyd

---

[5] Change.org argues that the terms of the FAQ and Promoted Petitions pages are also part of the parties' contract. *See* Joffe-Walt Decl., Exs. B & D. However, these pages were only hyperlinked to the Solicitation and Contribution screens, making them "browsewrap agreements" that are not enforceable as part of the contract absent evidence that the plaintiff had actual or constructive knowledge of their terms. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014) ("Because no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website, the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." (quoting *Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 790 (N.D. Ill. 2011)). Neither the SAC nor Mr. Joffe-Walt's declaration contain allegations that Mr. Randall had actual or constructive knowledge of the FAQ or the Promoted Petitions pages, for example by having affirmatively acknowledged the terms of these pages before making his contribution. *See id.* ("Courts have also been more willing to find the requisite notice for constructive assent where the browsewrap agreement resembles a clickwrap agreement—that is, where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website.")

Petition to advertise the Petition to millions of people on digital billboards all across the country, on Facebook and Instagram, and via e-mail. Joffe-Walt Decl. ¶ 18 Change.org also showed the Floyd Petition to 39 people as a result of Mr. Randall's contribution. *Id.* ¶ 24. There is no breach of contractual promise made by Change.org.

At the oral argument, Mr. Randall's counsel argued that the term "allow" means that Change.org was required to use at least "a significant portion of" the funds raised from the Floyd Petition on further advertising the petition. *See* Docket No. 39 (MTD Hearing Tr.) at 12:23 to 13:25. However, Mr. Randall made clear at the hearing and in his papers that he does not argue that the term "allows" is ambiguous and requires construction. *See e.g.* Docket No. 35 ("Opp'n") at 1 ("The facts here are simple, involving an ***unambiguous written contract*** that can only be interpreted one way under the contract's straightforward written terms." (emphasis added)). Thus, by placing his argument solely on the asserted plain meaning of the contract, and eschewing any argument that the contract is ambiguous and should be interpreted so as read in the "significant portion" limitation, Mr. Randall is left with assertion that the word "allow" plainly and unambiguously implies such a limitation. It does not.

Accordingly, Change.org's motion to dismiss is **GRANTED** because Mr. Randall has failed to allege that Change.org breached the plain meaning of the contract.

## IV. CONCLUSION

For the foregoing reasons, Change.org's Rule 12(b)(6) motion to dismiss is **GRANTED** without leave to amend because Mr. Randall failed to state a claim for breach of contract.

This order disposes of Docket No. 28. The Clerk is instructed to enter judgment and close the file.

**IT IS SO ORDERED**.

Dated: December 9, 2020

_____
EDWARD M. CHEN
United States District Judge